UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEVIN FARR,                          :
                                     :CIVIL ACTION NO. 3:12-CV-1414
          Plaintiff,                 :
                                     :
     v.                              :(JUDGE CONABOY)
                                     :
CAROLYN W. COLVIN,[1]                :
Acting Commissioner of Social        :
Security,                            :
                                     :
          Defendant.                 :
                                     :

_____

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's

denial of Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") under Titles II and XVI of the Social

Security Act ("Act"). (Doc. 1.) The Administrative Law Judge

("ALJ") who originally evaluated the claim found that Plaintiff had

the residual functional capacity ("RFC") to perform a full range of

work at all exertional levels with some nonexertional limitations,

that jobs existed which he could perform, and, therefore, Plaintiff

was not under a disability as defined in the Social Security Act

from the alleged onset date of January 1, 2004, through the date of

the decision, January 12, 2011. (R. 24, 26-27.) With this action,

Plaintiff argues that the determination of the Social Security

_____

[1]  Carolyn W. Colvin became the Acting Commissioner of Social
Security on February 14, 2013. Pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure, Carolyn W. Colvin should be
substituted for Michael J. Astrue as the defendant in this suit.
No further action need be taken to continue this suit by reason of
the last sentence of § 205(g) of the Social Security Act, 42 U.S.C.
§ 405(g).

Administration is error for three reasons: 1) the ALJ's RFC determination is not supported by substantial evidence; 2) the ALJ's credibility determination is not supported by substantial evidence; and 3) the ALJ's step five determination is not supported by substantial evidence. (Doc. 8 at 5.)

For the reasons discussed below, we conclude remand to the Acting Commissioner is required.

## I. Background

On May 13, 2009, Plaintiff protectively filed applications for Title II Disability Insurance benefits and Title XVI Supplemental Security Income. (R. 96-102.) Plaintiff, whose date of birth is March 25, 1963, claimed disability beginning on January 1, 2004. (R. 96.) Plaintiff listed the illnesses, injuries, or conditions that limited his ability to work as "epilepsy, grand mal seizures." (R. 115.) He added that he

> has at least one epileptic seizure a month and at least one grand mal seizure a a month. Seizures are unpredictable, body goes into convulsions and last about 5 min. It takes a couple hours to recover from seizure. After having epileptic seizure he becomes unaware of what's going on around him.

(R. 115.) At the time of his application, Plaintiff was married and living with his spouse. (R. 99.) Plaintiff had past work as a carpenter and roofer. (R. 26)

The Social Security Administration denied Plaintiff's applications by decisions issued on November 18, 2009. (R. 54-76.) On December 9, 2009, Plaintiff filed a timely Request for Hearing

2

before an Administrative Law Judge.  (R. 78.)  On January 7, 2011, ALJ Ronald Sweeda held a hearing at which Plaintiff and a vocational expert ("VE") testified.  (R. 32-47.)

In response to the question of why he was unable to work, Plaintiff responded that his grand mal seizures kept him from working.  (R. 37.)  Plaintiff testified that he had one to two grand mal seizures per month and one to two petit mal seizures per week.  (R. 38-39.)  He stated the grand mal seizures, which last five to ten minutes, cause him to fall down and afterwards he usually sleeps for up to half a day.  (R. 39.)  Plaintiff agreed with the ALJ that that the petit mal seizures are "staring spells [] essentially."  (R. 39.)  Plaintiff added that they can last two days and, although he can carry on a partial conversation during the course of the seizure, what he is saying does not make sense. (R. 39.)  At the time of the hearing, Plaintiff was taking Carbitrol and Lavetiractem.  (R. 38.)  Plaintiff reported that his treating physician, Mitchell J. Gross, M.D., was adjusting his medications to try to better control the seizures but the last adjustment (adding Lavetiractem) did not make any difference.  (R. 39-40.)

Following Plaintiff's testimony, the ALJ asked the VE whether there were jobs for a hypothetical claimant with the same age, education and work experience as Plaintiff with no exertional limitations, but with nonexertional limitations in that the individual should not be required to do any balancing, any climbing of ladders or scaffolds, and have no exposure to heights or to

3

dangerous moving machinery. (R. 44-45.) After confirming that
work as a carpenter would be precluded, the VE identified several
other positions. (R. 45.) The ALJ then added the limitation
indicated by Dr. Gross--because of seizure activity the individual
could be expected to miss three days a month or more of work
unexpectedly. (R. 45.) The VE responded there would be no jobs
for such a person. (R. 55.)

By decision of January 12, 2011, ALJ Sweeda found that
Plaintiff was not disabled within the meaning of the Social
Security Act. (R. 27.) The following findings of fact and
conclusions of law from the ALJ's decision are relevant to
Plaintiff's claimed errors: 1) Plaintiff has the residual
functional capacity to perform a full range of work at all
exertional levels but has nonexertional limitations in that he
should not balance, climb ladders, ropes, or scaffolds, or be
exposed to unprotected heights or moving machinery (R. 24); and 2)
there are jobs that exist that claimant can perform (R. 26).

Because the ALJ determined that jobs exist in the national
economy that Plaintiff can perform (R. 26), he concluded that
Plaintiff had not been under a disability as defined in the Social
Security Act from January 1, 2004, through the date of his
decision, January 12, 2011. (R. 27.)

Plaintiff requested review of the ALJ's decision, and on May
24, 2012, the Appeals Council issued a notice denying Plaintiff's
request. (R. 1.) Therefore, the ALJ's decision became the
decision of the Commissioner.

Plaintiff filed this action on July 23, 2012. (Doc. 1.) He filed his brief in support of the appeal on December 9, 2012. (Doc. 8.) Commissioner Astrue filed his opposition brief on February 3, 2013. (Doc. 12.) Plaintiff filed a reply brief on February 15, 2013. (Doc. 13.) Therefore, this matter is fully briefed and ripe for disposition.

## II. Discussion

### A. *Relevant Authority*

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2] It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the

---

[2] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  A reviewing court is "bound by the ALJ's findings of fact if they are supported by substantial evidence in the record."  *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Plummer*, 186 F.3d at 427

(quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). Therefore, we will not set aside the Commissioner's final decision if it is supported by substantial evidence, even if we would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .")). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). These proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his

claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

Finally, the Third Circuit has recognized that it is necessary for the Secretary to analyze all evidence. If he has not done so and has not sufficiently explained the weight he has given to all probative exhibits, "to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky*, 606 F.2d at 407. In *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981), the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected. "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation

from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Id.* at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). Only where the ALJ rejects conflicting probative evidence must he fully explain his reasons for doing so. *See*, *e.g.*, *Walker v. Comm'r of Soc. Sec.*, 61 F. App'x 787, 788-89 (3d Cir. 2003) (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Further, the ALJ does not need to use particular language or adhere to a particular format in conducting his analysis. *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

## B. *Plaintiff's Alleged Errors*

As set out above, Plaintiff asserts the ALJ erred on three bases: 1) the ALJ's RFC determination is not supported by substantial evidence; 2) the ALJ's credibility determination is not supported by substantial evidence; and 3) the ALJ's step five

determination is not supported by substantial evidence.  (Doc. 8 at 5.)  We will address each in turn.

**1.  *Residual Functional Capacity***

Plaintiff asserts the ALJ's residual functional capacity assessment is error for two reasons.  First, the ALJ incorrectly afforded "little weight" to the opinion of Plaintiff's treating physician, Dr. Gross.  (Doc. 8 at 6.)  Second, the ALJ incorrectly afforded "great weight" to the determination of the Agency disability examiner, Patricia Lenahan.  (Doc. 8 at 10.)

**a.  <u>Treating Physician's Opinion</u>**

Plaintff maintains the ALJ erred in giving "little weight" to Dr. Gross's opinion.  (Doc. 8 at 6-10.)  We agree that the ALJ's analysis of Dr. Gross's opinion is flawed and his RFC determination is not supported by substantial evidence.

Under applicable regulations and the law of the Third Circuit, a treating doctor's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  The "treating physician rule," is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit.  *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the weight to be given a treating physician's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and

10

severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 416.927(c)(2).[3] "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.

---

[3] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

11

2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Here the ALJ stated he gave little weight to Dr. Gross's assessment that Plaintiff's condition is likely to force him to be absent from work three or four times in a month. (R. 25 (citing Ex. 16F, 4).) He provides the following reasons for his determination: "Dr. Gross does not give any specific support for such a finding and the claimant himself only claims experiencing one to two seizures a month, though . . . the medical record and his history of sporadic follow-up care suggest they might be less frequent than even that." (R. 25.)

Plaintiff first asserts that Dr. Gross's opinion is adequately supported in that the opinion was based on his lengthy treatment of Plaintiff: Dr. Gross treated Plaintiff from at least July 7, 2004, to August 29, 2010, and Dr. Gross indicated that he treated Plaintiff every four to six months. (Doc. 8 at 7 (citing R. 151-52, 154, 223, 319, 321-23, 326).) Plaintiff adds that the ALJ improperly substituted his opinion for that of the treating

physician with his speculation that the record and follow-up care might indicate less frequent seizures. (Doc. 8 at 7.)

To the extent the ALJ discounted the treating physician's opinion because it conflicted with that of the state agency examiner who reported in her November 2009 review that the file did not document any seizures since January of 2009 (R. 25 (citing Ex. 14F, 6)), Plaintiff asserts the record shows that he experienced seizures as reported by his treating physician. (Doc. 8 at 8 (citing R. 152, 323, 326).) Plaintiff's citations to the record include the April 28, 2010, visit to Dr. Gross where Dr. Gross noted that Plaintiff reported "[h]e is still having intermittent spells--mostly of mild disorientation every 8 days or so--where he is spacey, disoriented and about once every 4-6 weeks he will have a generalized seizure." (R. 323.) Plaintiff also points to his report to Dr. Gross that he does not usually go to doctors or the emergency room with his seizures as an explanation of why Dr. Gross may not know the dates of Plaintiff's seizures. (Doc. 8 at 8 (citing R. 152, 326).)

Our review of the record confirms that Plaintiff treated regularly, albeit at times infrequently, with Dr. Gross. The record also shows that Plaintiff's subjective reports and treatment history present a relatively consistent picture.

In July 2004, Dr. Gross's office visit notes indicate Plaintiff reported having a generalized seizure once a week in the

13

spring and had a related motor vehicle accident. (R. 151.) He had not been working "due to the spells," and he was having "milder" spells at the time of his office visit where he is staring and lightheaded for up to a few hours. (R. 151.) Dr. Gross's impression was "medically intractable seizures." (R. 151.)

In January 2006, Dr. Gross's office visit notes indicate Plaintiff had been calling in for meds since his visit in July 2004, Plaintiff reported the continuing seizures and that he does not go to the doctor (at the time his primary care physician was Lisa Robertson, D.O.) or emergency room after he has a seizure. (R. 152.) Dr. Gross's impression is "medically intractable seizures." (R. 152.)

In May 2007, Plaintiff was taken by ambulance to Tyler Memorial Hospital when he fell in a driveway as he was having a seizure. (R. 195.) Bystanders told emergency service personnel that Plaintiff "has seizures often, and has been known not to take his medicine all the time." (R. 195.)

In August 2007, Plaintiff told Dr. Gross that his spells had been better for a few weeks but before that time he was having partial seizures weekly and occasional general seizures. (R. 154.) Dr. Gross's impression was "seizure disorner – medically intractable." (R. 154.)

In October of 2008, Plaintiff suffered a high-pressure hand injury related to a seizure. (R. 242, 285.)

14

On January 20, 2009, Plaintiff was taken to Community Medical Center due to a seizure-related injury and had a second seizure while in the emergency room. (R. 214.) He suffered a jaw fracture related to the seizure. (R. 238.)

On February 25, 2009, Dr. Gross saw Plaintiff and provided a summary to Plaintiff's primary care physician, Lisa Robertson, D.O. (R. 223.) Dr. Gross reported to Dr. Robertson that Plaintiff continued to have seizures (at least once a month) and had experienced injuries related to the seizures--a motor vehicle accident, a jaw fracture, and a hand injury from equipment he was handling at the time of a seizure. (R. 223.) Dr. Gross noted that Plaintiff had a closed head injury when he was fifteen years old and the seizures started several months later. (R. 224.) He added that "initially the [seizures] were better controlled but have been difficult to control for a number of years." (R. 224.) Dr. Gross's impression was "medically intractable [seizure] disorder." (R. 286.)

In October of 2009, Plaintiff saw Vithalbhai Dhaduk, M.D., for a neurological disability examination. (R. 295.) Dr. Dhaduk's report states that Plaintiff "has been having quite multiple seizures," getting about one to two seizures per month where he feels lightheaded and passes out for three to five minutes then sleeps most of the day. (R. 295.) His last seizure had been two weeks prior to Dr. Dhaduk's examination. (R. 295.) Plaintiff

15

reported feeling tired and that he had not been able to work because of the seizures.  (R. 195.)  Dr. Dhaduk noted that Plaintiff had a motor vehicle accident in July 2008 where he broke his jaw after he hit a tree when he had a seizure.  (R. 296.)  His impression included "complex partial seizure with a generalized tonic-clonic seizure disorder under poor control."  (R. 297.)  Dr. Dhaduk found that Plaintiff's prognosis was very poor overall.  (R. 298.)  He strongly recommended that another medication be added to his seizure medication regimen.  (R. 298.)

In April 2010, Dr. Gross's office visit notes indicate Plaintiff reported he was "still having intermittent spells--mostly mild spells of disorientation every 8 days or so--where he is spacey, disoriented and about once every 4-6 weeks he will have a generalized seizure."  (R. 323.)  Plaintiff was not working at the time of this visit.  (R. 323.)

In October 2010, Dr. Gross's office visit notes indicate Plaintiff reported he was having occasional breakthrough seizures-- occurring several times a month.  (R. 319.)  Plaintiff also reported having

> milder spells of staring--lasting for hours
> to all day--with associated confusion, dazed
> appearing, eyes look glossed over/droop.  He
> can walk during these spells but is "out of
> it"--can carry on a partial conversation with
> limited content--occurring about once a week.
> He will have some generalized T-C [seizures]
> after having the milder spells or without any
> warning whatsoever.  His generalized spells
> are followed by fatigue and he might have a

16

second spell the same day.

(R. 319.)

Regarding the ALJ's claimed lack of support for Dr. Gross's opinion on the amount of time Plaintiff's condition would likely cause him to miss work (R. 25), the ALJ's assigment of limited weight to Dr. Gross's opinion is not consistent with the requirements and guidance set out above. First, we note that the form question was not how many grand mal or generalized seizures Plaintiff had per month, rather it asked how often the patient's condition would likely cause him to be absent from work. (R. 328.) It is clear Dr. Gross treated Plaintiff over a long period of time and consistently noted that Plaintiff experienced both generalized seizures and intermittent spells. The review of the record set out above also shows that Plaintiff's seizures and spells varied in frequency and intensity over the years Dr. Gross treated him.

In many reports, the frequency of generalized seizures and "spells" of varying duration equaled or exceeded Dr. Gross's estimate of the number of days Plaintiff's condition would cause him to be absent from work. Perhaps Dr. Gross combined the impact of grand and petit mal seizures as the numbers would be more consistent with Plaintiff's reports to Dr. Gross at about the same time as Dr. Gross completed the questionnaire in which he opined about the effects of Plaintiff's condition. (*See* R. 319, 323.) His notation that Plaintiff experiences seizures on the average of

once a week which last from minutes to several hours (R. 334) is also consistent in frequency and duration with a consideration of both generalized seizures and "spells." (*See* R. 151, 154, 223, 319, 323.) These considerations point to ambiguity which should not be decided against Plaintiff given the state of the record. If the record is inadequate for proper evaluation of the evidence, the ALJ's duty to develop the record is triggered. *See, e.g., Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).

We recognize that in his report Dr. Gross identified "seizure disorder – intractable" as the diagnosis and identified the type of seizure as "generalized" and that the frequency of Plaintiff's generalized seizures was not reported to be three to four times monthly. However, given the nature and complexity of Plaintiff's disorder, the ALJ should not have so readily rejected Dr. Gross's opinion or found it to be contradictory to Plaintiff's report. This is particularly so given Dr. Dhaduk's observations regarding Plaintiff's condition and prognosis as well as *Dobrowolsky*'s guidance that leniency is to be shown in establishing the claimant's disability, and the the Secretary's responsibility to rebut it is to be strictly construed, 606 F.2d at 406.

We are not persuaded otherwise by Defendant's assertion that the ALJ appropriately weighed the evidence based on numerous inaccuracies and misstatements in Dr. Gross's questionnaire. (*See* Doc. 12 at 8.) Defendant provides specific bases for this general

assertion (Doc. 12 at 8-9) which we will briefly review.

First, Defendant points to Dr. Gross's notation in his RFC Questionnaire that he had contact with Plaintiff every 4 to 6 months for outpatient evaluation but he saw Plaintiff just six times over a seven-year period. (Doc. 12 at 8 (citing R. 151-54, 285-86, 319, 323, 334).) The form, which Dr. Gross completed on September 24, 2010, requests "Nature, frequency and length of contact." (R. 326.) Dr. Gross wrote: "every 4-6 month outpt eval." (*Id.*)

Dr. Gross had seen Plaintiff in April 2010, and because he saw him again in October 2010 for a routine office visit, a reasonable inference can be made that the October visit was scheduled when Dr. Gross filled out the questionnaire in September 2010. (R. 319, 323.) If so, Dr. Gross's four to six-month time estimate would be accurate for the then-current time frame. Also, the record indicates that Plaintiff "called in for meds" between visits. (R. 152.) While the record does not indicate any telephonic evaluation took place when Plaintiff called in, such calls would indicate more frequent contact with Plaintiff than the six visits cited by Defendant.

Defendant next cites Dr. Gross's insertion of a check mark to suggest Plaintiff could not lift over ten pounds--an assessment for which he provided no support and which is unsupported by other evidence in the record. (Doc. 12 at 8-9 (citing R. 207-08).) We

agree the record does not support such a limitation.

Third, Defendant points to Dr. Gross's indication that Plaintiff was compliant with his medications, a conclusion Defendant claims to be at odds with Dr. Gross's notes that allegedly show Plaintiff was not compliant. (Doc. 12 at 9 (citing R. 151-53, 285-86, 319, 323).) The record shows Plaintiff did not add Keppra to his medication regimen as suggested by Dr. Gross when he prescribed it at some office visits (see R. 154, 223, 319) although Plaintiff may have added it subsequently (R. 332, 333). Dr. Gross does not provide any additional information about Keppra or Plaintiff's failure to try it. Dr. Gross noted in 2006 that Plaintiff reported that he is generally compliant with his meds but admitted to occasionally missing a dose. (R. 152.)

Given the complexity of Plaintiff's seizure disorder, Plaintiff's testimony that Dr. Gross tried different drugs, some of which did not "make a difference" (R. 39-40), and the fact that Dr. Gross did not elaborate on the medication issue, Defendant's claimed inconsistency would attribute to the ALJ improper speculative inference.[4] *See Morales*, 225 F.3d at 317.

---

[4] In deciding the impact of a claimant's failure to take a prescribed medication, a claimant's reasons for not taking prescribed medication must be considered as well as the effect the medication would have on the claimant's ability to work. 20 C.F.R. § 416.930 addresses what treatment a claimant must follow to get benefits: "in order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore you ability to work." 20 C.F.R. § 416.930(a). Here we do not know why Plaintiff did not take the prescribed Keppra and we do not know if

Finally, Defendant asserts Dr. Gross's statement that Plaintiff would miss 3-4 days of work per month is unsupported and inconsistent with the examination findings of Drs. Robertson and Dhaduk (Doc. 12 at 9 (citing R. 207-08, 295-98)). Our review of Defendant's record citations shows that neither Doctor Robertson nor Dr. Dhaduk opined on the number of days Plaintiff might miss work or his ability to work. (*Id.*) Dr. Dhaduk noted in his report dated October 16, 2009, that Plaintiff reported he was not working due to his seizures. (R. 295.) Dr. Dhaduk did not offer an opinion on Plaintiff's subjective report. As noted above, Dr. Dhaduk concluded that Plaintiff's prognosis was "very poor." (R. 298.) Dr. Robertson's October 24, 2008, notes reflect that Plaintiff was seen as a follow-up to the hand injury he suffered on October 15, 2008. (R. 207-08, 242.) Dr. Robertson's notes do not indicate that Plaintiff's seizure disorder was discussed or considered. (R. 207-08.) Thus, while these records cannot be considered supportive of Dr. Gross's determination regarding potential work absences, they cannot be construed as inconsistent

taking it would have restored Plaintiff's ability to work. Record evidence suggests Plaintiff may have tried Keppra in that it was listed as one of his medications in Geisinger outpatient notes dated October 25, 2010, and December 7, 2010. (R. 332, 333.) Plaintiff did not list Keppra as one of his medications at Plaintiff's ALJ hearing on January 7, 2011, where Plaintiff testified that Dr. Gross was adjusting his medications to try to better control the seizures and the last adjustment (adding Lavetiractem) did not make any difference. (R. 38-40.)

with his opinion in that they do not address the subject.

Because we find overall that Defendant's cited bases for inconsistency do not readily discount deference due to Dr. Gross's treating physician status, our conclusion regarding the ALJ's error stands. We further note that Defendant's cited inconsistencies, to the extent they are not identified by the ALJ, cannot serve as support for the ALJ's decision in that Defendant cannot do at this stage of the proceedings what the ALJ should have done. It is the ALJ's responsibility to explicitly provide reasons for his decision and the analysis later provided by Defendant cannot make up for the analysis lacking in the ALJ's decision. *Fargnoli*, 247 F. 3d at 42 n.6; *Dobrowolsky*, 606 F.2d at 406-07; *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council.")

### b. **Disability Examiner's Opinion**

Plaintiff next argues that the ALJ erred in affording "great weight" to the determination of the disability examiner, Patricia Lenahan. (Doc. 8 at 10.) We agree that the ALJ's reliance on the disability examiner's report was improper and was not harmless error as argued by Defendant (*see* Doc. 12 at 12).

Plaintiff points to *Yorkus v. Astrue*, No. Civ. A. 10-2197, 2011 WL 7400189 (E.D. Pa. Feb. 28. 2011), in support of his

assertion that the ALJ improperly relied on Lenahan's assessment. (Doc. 8 at 11.) Plaintiff asserts, and Defendant does not refute, that Lenahan is a SDM, "single decision-maker." (Doc. 8 at 12; Doc. 12 at 11-12.) *Yorkus* explains that a single decision-maker is a non-examining, non-medical employee at the state agency level. 2011 WL 7400189, at *4. *Yorkus* cites "significant case law" and "the Agency's own policy" in concluding that a SDM's RFC assessment is not to be accorded any evidentiary weight when an ALJ is deciding a case at the hearing level. 2011 WL 7400189, at *4 (listing cases and administrative documents).

*Yorkus* also recognizes case law where the ALJ's error regarding SDM RFC assessments was found to be harmless error and, therefore, not cause for remand. *Id.* at *5 (citing *Talahamantes v. Astrue*, 370 F. App'x 955 (10th Cir. 2010); *Jones v. Astrue*, 1:07-cv-0698-DFH-WTL, 2008 WL 1766964, at *9 (S.D. Ind. Apr. 14, 2008)). However, given the facts of the case, *Yorkus* could not conclude the error was harmless: the record was unclear as to whether the ALJ knew that the RFC assessment was completed by a SDM rather than a medical consultant; it was clear he placed "great weight" on the state agency RFC assessment; and the court could not determine if the ALJ would have come to the same conclusion if he had initially disregarded the RFC assessment. 2011 WL 7400189, at *5.

Here the ALJ attributed the RFC assessment to the "State agency medical consultant." (R. 25.) Because the RFC assessment

was *not* completed by a medical examiner (R. 316) and because the ALJ placed "great weight" on the assessment (R. 25), like *Yorkus* we cannot determine if the ALJ would have come to the same conclusion if he placed no weight on the RFC assessment. This is particularly so because the ALJ continually interprets and/or discredits other evidence based on his reliance on the RFC assessment. (R. 25.) Therefore, we cannot conclude the ALJ's reliance on the RFC assessment was harmless error and, upon remand, the ALJ should not consider the SDM's RFC assessment.

**2.    *Plaintiff's Credibility***

Plaintiff next asserts that the ALJ's credibility determination is not supported by substantial evidence. (Doc. 8 at 12.) We agree.

Generally, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir.1997) (citation omitted). Social Security Ruling 96-7p gives the following instructions in evaluating the credibility of the claimant's statements regarding his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or

24

> other symptoms and their functional effects
> is the degree to which the statements can be
> believed and accepted as true.  When
> evaluating the credibility of an individual's
> statements, the adjudicator must consider the
> entire case record and give specific reasons
> for the weight given to the individual's
> statements.

SSR 96-7p.

Here the ALJ concluded that Plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (R. 25.)  This is the ALJ's only specific rationale provided for his finding on Plaintiff's credibility.

Our review of the record reveals no evidence that Plaintiff's treating physician or consulting physician found Plaintiff's subjective complaints inconsistent with their examinations and diagnostic findings.  Dr. Gross regularly recorded Plaintiff's subjective reports of seizure frequency, duration and after-effects.  (R. 151, 152, 154, 223, 319, 323.)  At no time did he discount or question Plaintiff's reports.  Dr. Dhaduk, the consulting examiner, reviewed Plaintiff's subjective reports concerning his disorder and did not make any finding or provide any comment about Plaintiff's credibility.  (R. 295-98.)

The ALJ's statement that Plaintiff's reports concerning "the intensity, persistence and limiting effects of these symptoms are

25

not credible to the extent they are not consistent" with his RFC determination (R. 25) may be a statement of his assessment of Plaintiff's subjective reporting, but, as asserted by Plaintiff, it does not provide a valid reason for discounting the alleged symptoms. (*See* Doc. 8 at 14 (citing *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)).) In *Bjornson*, the Seventh Circuit criticized the same language as that of the ALJ here, referring to it as "opaque boilerplate" similar to the "meaningless boilerplate" identified in an earlier decision. 671 F.3d at 644 (citing *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)). The Seventh Circuit explained its reasoning in *Filus v. Astrue*, 694 F.3d 863 (7th Cir. 2012).

> We criticized this boilerplate in *Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012), and our opinion has not changed since *Bjornson* was issued. Obvious problems include the fact that the ALJ's finding of residual functional capacity is not "above" in the opinion but is yet to come, and the fact that this statement puts the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion. In *Bjornson*, this flaw required us to reverse and remand, but that is not always necessary. If the ALJ has otherwise explained his conclusion adequately, the inclusion of this language can be harmless.

694 F.3d at 868.

In this case, the ALJ has not otherwise explained his credibility finding. (*See* R. 25.) Defendant's argument that the

ALJ's credibility analysis covers two pages (Doc. 12 at 13) is not persuasive. Although the ALJ's general analysis contrasts Plaintiff's testimony with the State agency consultant's assessment and other record evidence (R. 25), the ALJ does not do so in the context of his discussion of Plaintiff's credibility.[5]

---

[5] To the extent the ALJ finds Plaintiff received "only sporadic treatment" (R. 25) and should find this significant upon remand consideration, further development of the record may be appropriate to properly analyze Plaintiff's assertion that he generally does not go to doctors or emergency rooms when he has a seizure (R. 326). We further note that this statement, made to Plaintiff's treating physician, is "information in the case record []that may explain infrequent or irregular medical visits" which must be considered before an ALJ can draw any inferences about a claimant's failure to seek or pursue regular medical treatment pursuant to SSR 96-7p. Defendant's assertion that Plaintiff failed to provide any explanation for receiving sporadic treatment (Doc. 12 at 14) ignores the above-cited information in the case record which would properly be considered in the ALJ's inquiry.

In support of the ALJ's credibility determination, Defendant's references to Plaintiff's alleged non-compliance with medications and failure to explain contradictory work history are not relevant in that these matters were not raised by the ALJ. As set out in the text, Defendant cannot now do what the ALJ should have done. It is the ALJ's responsibility to explicitly provide reasons for his decision and the analysis later provided by Defendant cannot make up for the analysis lacking in the ALJ's decision. *Fargnoli*, 247 F. 3d at 42 n.6; *Dobrowolsky*, 606 F.2d at 406-07; *Newton*, 209 F.3d at 455.

Even if these matters were properly considered, Defendant's references to medication compliance and work history would not alter our conclusion that the ALJ's credibility decision is not supported by substantial evidence. We previously discussed the merits of the medication compliance issue. *See supra* pp. 20-21 & n.4. The significance Defendant attributes to alleged work history inconsistencies (Doc. 12 at 14) is similarly unpersuasive in that the details of any work done during the period where Defendant identifies a conflict are not present in the record and both context and specific meaning are significant. Engaging in some work does not necessarily mean engaging in substantial gainful

Furthermore, because we have found the ALJ's opinion evidence considerations to be error and his review of the record and selective reliance wanting, a related credibility finding is not supported by substantial evidence. Therefore, we cannot consider the inclusion of the boilerplate harmless and the case must be remanded for consideration of this issue.

**3.    *Step Five Determination***

Finally, Plaintiff argues the ALJ's step five determination is not based on substantial evidence. (Doc. 8 at 14.) For reasons related to our finding cause for remand in the ALJ's discounting of the treating physician's opinion, his attribution of "great weight" to the SDM's RFC assessment, and his credibility determination, we cannot conclude the ALJ's step five determination is supported by substantial evidence.

*Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005), discusses objections related to an ALJ's conclusion at step five--objections to the determination that the plaintiff retained the functional

---

activity which is the relevant statutory question. *See Chicager v. Califano*, 574 F.2d 161, 163-64 (3d Cir. 1978); *Stark v. Weinberger*, 497 F.2d 1092, 1100 (7th Cir. 1974). Moreover, in this case, the ALJ specifically found, without comment about any conflicting evidence, that "[t]he claimant has not engaged in substantial gainful activity since January 1, 2004, the alleged onset date (29 C.F.R. 404.1571 et seq., and 416.971 et seq.)." (R. 23.)

capacity to perform jobs existing in the workforce. 399 F.3d at 553. *Rutherford* notes this determination is normally based in large measure on testimony provided by a vocational expert and objected to on the basis that the testimony cannot form the basis of a substantial evidence determination because it was based on responses to hypothetical questions that did not adequately consider the plaintiff's physical limitations. *Id.* *Rutherford* extensively reviews Third Circuit guidance concerning the issue, observing that

> objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself. That is, a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert. Challenges of the latter variety . . . are really best understood as challenges to the RFC assessment itself.

*Rutherford*, 399 F.3d at 554 n.8.

In *Podedworny v. Harris*, 745 F.2d 210 (3d Cir. 1984), the Circuit Court discussed the proper use of expert testimony.

> Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert. The ALJ will normally

29

> ask the expert whether, given certain
> assumptions about the claimant's physical
> capability, the claimant can perform certain
> types of jobs, and the extent to which such
> job exist in the national economy. While the
> ALJ may proffer a variety of assumptions to
> the expert, the vocational expert's testimony
> concerning a claimant's ability to perform
> alternative employment may only be considered
> for purposes of determining disability if the
> question accurately portrays the claimant's
> individual physical and mental impairments.
> Thus the expert must have evaluated
> claimant's particular impairments as
> contained in the record.

745 F.2d at 218. *Rutherford* clarifies that an ALJ is not required
to submit to the vocational expert "every impairment *alleged* by a
claimant." 399 F.3d at 554. Rather, the hypothetical posed must
"accurately convey to the vocational expert all of a claimant's
*credibly established limitations.*"[6] *Id.* (citing *Plummer*, 186 F.3d
at 431.)

Case law and regulations[7] address when a limitation is
credibly established. 399 F.3d at 554.

> Limitations that are medically supported and
> otherwise uncontroverted in the record, but
> that are not included in the hypothetical
> question posed to the expert, preclude
> reliance on the expert's response (*Burns*, 312
> F.3d at 123). Relatedly, the ALJ may not

---

[6] *Rutherford* notes that "[a]lthough the impairment must be
medically determinable, it need not be a 'severe' impairment to be
considered in the RFC assessment." 399 F.3d at 554 n.7 (citing 290
C.F.R. § 945(a)(2)).

[7] *Rutherford* specifically identifies 20 C.F.R. §§ 416.945,
929(c) and 927) as relevant to the inquiry. 399 F.3d at 554.

substitute his or her own expertise to refute such record evidence (*Plummer*, 186 F.3d at 429). Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible--the ALJ can choose to credit portions of the existing evidence but "cannot reject evidence for no reason or for the wrong reason" (a principle repeated in *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)[)]; [20 C.F.R. § 416.]929(c)(4)). Finally, limitations that are asserted by the claimant but lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it. ([20 C.F.R. § 416.](c)(3)).

399 F.3d at 554.

Given this framework, the errors previously discussed are relevant to the ALJ's step five determination in that they directly relate to his RFC assessment, an assessment which occurs between steps three and four, 20 C.F.R. § 404.1520(a)(4). Further, the ALJ does not mention limitations about which Plaintiff testified: Plaintiff indicated that, in addition to the one or two grand mal seizures he experienced per month, he had one to two petit mal seizures per week. (R. 39.) Plaintiff concurred with the ALJ that these were "staring spells, essentially," and added that they can last two days and limit his ability to function normally. (R. 39.) The VE was not given a hypothetical that included Plaintiff's reported (and uncontradicted) combined grand and petit

mal seizure frequency and effects although the ALJ found Plaintiff's "seizure disorder" in general to be a severe impairment. (R. 23, 44-45.) Similarly, Dr. Gross's uncontradicted opinions that Plaintiff's seizures were likely to disrupt the work of co-workers and that he would need more supervision than an unimpaired worker (R. 327) were not presented in a hypothetical to the VE. In his opinion the ALJ does not provide any rationale for finding these limitations not credible. Therefore, pursuant to the case law and relevant regulations reviewed above, the ALJ's step five determination cannot be considered to be supported by substantial evidence.

### III. Conclusion

For the reasons discussed above, this case must be remanded to the Commissioner for further consideration consistent with this opinion. An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: January 6, 2014

32